# EXHIBIT 25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
PERO ANTIC,

                Plaintiff,                Civil Action No. 16-cv-2425 (JMF)

    -against-                       AFFIDAVIT OF
                                                      WALTER SIGNORELLI

THE CITY OF NEW YORK, POLICE
OFFICER RICHARD CASTER, individually and
In his capacity as a member of the New York City
Police Department, POLICE OFFICER PAUL
GIACONA, individually and in his capacity as a
Member of the new York City Police Department,
POLICE OFICER DANIEL DONGVORT,
Individually and in his capacity as a member of the
New York City Police Department, POLICE OFFICER
MICHAEL O'SULLIVAN, individually and in his
Capacity as a member of the New York City Police
Department, and JOHN and JANE DOES, said names
Being fictitious and intended to represent individual
Officers, members, agents, servants and/or employees
Of the New York City Police Department in their
Individual and official capacity,

                Defendants.
----------------------------------------------------------------X
TABO SEFOLOSHA,

                Plaintiff,              16-cv-2564 (JMF)

    -against-

P.O. JOHN PAUL GIACONA, et. al.

----------------------------------------------------------------X

        WALTER SIGNORELLI, being duly sworn, deposes and says:

    1.    I make this Affidavit as a supplement to the March 2, 2017 report I prepared in

relation to the above matter in accordance with Federal Rules of Civil Procedure, Rule 26(a)(2).

I swear to the opinions rendered in that report and will testify in accordance with them.

2.  Regarding my qualifications as police procedures expert, I am a retired member of the New York City Police Department (NYPD), having served for more than 31 years. During my tenure I held the ranks of Police Officer, Sergeant, Lieutenant, Captain, Deputy Inspector, and Inspector. I served in numerous capacities including patrol officer; patrol sergeant; anti-crime sergeant; lieutenant tour commander; Executive Captain of the 46th Precinct, Bronx; Commanding Officer, Manhattan North Police Morals Division; Commanding Officer of the 79th Precinct in Bedford-Stuyvesant, Brooklyn; Executive Officer, Employee Management Division; Commanding Officer, Staff Services Section of the Personnel Bureau; Commanding Officer of the 24th Precinct, Upper Manhattan; Executive Officer of the Bronx Narcotics Division; Commanding Officer of the License Division; Executive Officer of the Narcotics Division; Executive Officer of the Manhattan North Narcotics Initiative; and Executive Officer, Brooklyn South Detective Division. During my tenure, I conducted, supervised, and reviewed thousands of arrests and supervised numerous crowd control situations. All of the positions noted above entailed training and supervision responsibilities, arrests, crowd control, and use of force.

3.  During my police career, I received extensive and continual training regarding arrests, crowd control, and use of force. In the Police Academy, and, particularly, upon promotions, in the Sergeant, Lieutenant, and Captain's schools, I received intense training, which involved studying the best practices and procedures, role playing, and use of force tactics. As a superior officer in the ranks of Captain, Deputy Inspector, and Inspector, over a nineteen-year period, I investigated, evaluated, and made recommendations for training or discipline of police officers regarding arrests, crowd control and use of force.

4. Since my retirement from NYPD, I have taught police science and criminal law courses at John Jay College of Criminal Justice and St. John's University, including courses in police administration, the patrol function, criminal investigation, and criminal law. In my seventeen years as an instructor at the college, and in other capacities, I have kept apprised of developments in police practices and procedures. I have authored three books related to police and criminal justices matters, which are listed on the attached curriculum vitae.

5. I have been retained as a consultant by both plaintiffs and defense (including the City of New York and the City of New York Housing Authority) in a number of police liability cases, and have testified as a police procedures expert in both State and Federal courts. Attached please find a list of prior testimonies.

6. Based on my experience, training, education, and background, I rendered my opinion in this matter to a reasonable degree of professional certainty regarding proper police practices and procedures.

WALTER SIGNOORELLI

Sworn to before me this
27th Day of April, 2017

AINSLEE YU
Notary Public - State of New York
NO. 01YU6304240
Qualified in Westchester County
My Commission Expires May 27, 2018

WALTER SIGNORELLI, ESQ.
2020 Maple Hill Street
PO Box 1255
Yorktown Heights, New York 10598

March 2, 2017

The Cochran Firm
55 Broadway, 23rd floor
New York, NY 10006

Re: Pero Antic v. City of New York, et al., U.S. District Court, SDNY, No. 16-CV-2425

    1. Regarding the above matter, I have prepared this report, which constitutes my opinion within a reasonable degree of professional certainty of the actions and procedures employed by members of the New York City Police Department (NYPD) in connection with arrest of the plaintiff Pero Antic for the charges of obstructing governmental administration, disorderly conduct, and harassment. My opinion is based on the documents provided and my experience, training, education, and professional background, which are described below. I reserve the right to revise this opinion upon the receipt of additional information.

    2. I am a retired member of the NYPD, having served for more than (31) thirty-one years. During my tenure, I held the ranks of Police Officer, Sergeant, Lieutenant, Captain, Deputy Inspector, and Inspector, and served in numerous capacities, including patrol officer, patrol sergeant, anti-crime sergeant, lieutenant tour commander, Executive Captain of the 46th Precinct, Bronx; Commanding Officer, Manhattan North Public Morals Division; Commanding Officer of the 79th Precinct in Bedford-Stuyvesant, Brooklyn; Commanding Officer, Staff Services Section of the Personnel Bureau; Commanding Officer, 24th Precinct., Upper Manhattan; Executive Officer, Bronx Narcotics Division; Commanding Officer, License Division; Executive Officer, Narcotics Division; Executive Officer, Manhattan North Narcotics Initiative; and Executive Officer, Brooklyn South Detective Division.

    3. During my tenure, I conducted, supervised, and reviewed thousands of arrests and many incidents involving the use of force. All of the positions noted above entailed training and supervision responsibilities regarding investigations, arrests, and use of force.

    4. Since my retirement from NYPD, I have taught police science and criminal law courses at John Jay College of Criminal Justice, New York, NY, and St. John's University, New York, NY, including courses in police administration, criminal investigation, constitutional law, and criminal law. I have been retained as a consultant by both plaintiffs and defense in a number of police liability cases, and have testified as a police procedures expert in both State and Federal courts.

1

## MATERIALS REVIEWED

5. The following is a list of materials pertaining to the incident and individuals involved that I reviewed thus far:

      a. Plaintiff's Verified Amended Complaint;
      b. NYPD documents, including arrest reports and pedigree forms;
      c. Criminal court affidavit;
      d. Certificate of disposition;
      e. Dismissal order of Hon. Kevin McGrath;
      f. 50H transcript of plaintiff, Pero Antic;
      g. Deposition transcript of Officer Giacona;
      h. Deposition transcript of Officer O'Sullivan;
      i. Deposition transcript of Officer Caster;
      j. Deposition transcript of Officer Dongvort;
      k. Deposition transcript of Officer Rossi;
      l. Deposition transcript of Officer Porteus;
      m. Deposition transcript of Cherrise Porter;
      n. Criminal Trial transcripts, 10/7, 8/15, including testimony of Officers Rossi and Porteus, Amos Canty, Stacey Slade, Pero Antic, Cherise Porter, Carolyn Colon, Sergeant Fontana, Officers Giacona, Caster, and Dongvort;
      o. Civilian Complaint Review Board (CCRB) investigation file, including statement of Thabo Sefolsoha, Officers Giacona and Caster;
      p. Videos of incident;
      q. Audios of interviews.

## SUMMARY OF FACTS

6. On April 8, 2015, at 4:28 a.m., in front of 453 West 17th Street, New York, N.Y., NYPD Police Officers Paul Giacona and Michael O'Sullivan, assigned to the 10th Precinct Cabaret Unit, arrested the plaintiff Pero Antic, used force against him, handcuffed him, and charged him with menacing, obstructing governmental administration, disorderly conduct, and harassment.

7. According to NYPD documents and the criminal court affidavit, this incident occurred as the police officers were telling patrons of the 1 Oak Club to leave the area on West 17th Street. Officer Paul Giacona testified that this was done every night around the closing time of the clubs on West 17th Street. (Cr.Tr. 5:16-25; 10:12-26). In addition, on the night in question, a stabbing had occurred in front of 1 Oak Club and the police established a crime scene with crime scene tape in front of the club. Officer Giacona testified that Sergeant Fontana directed the officers "to escort and push the patrons towards Tenth Avenue," and to "Clear the street, clear the sidewalk just push everyone . . . to Tenth Avenue." (20:8-13; 21:19-23). The police directed people to walk west to Tenth Avenue.

8. Officer Giacona testified that as he was clearing the patrons from the street, he noticed that Mr. Antic and Mr. Sefolosha had only moved a couple of feet. He told them several times to move down the street, and (Sefolosha) said to him "...you're a midget, if I was a midget I would be upset also." (28:5-19). Sefolosha and Antic began walking. They reached the corner of Tenth Avenue in about three or four minutes from when they were first told to leave the club. The corner at Tenth Avnue was about 75 feet from the crime scene (46:19-21; 51:7-9). On Tenth Avenue, Officer Giacona saw two other officers struggling with Sefolosha, and he assisted them in handcuffing him. (64:8-9; 65:2-10).

9. While assisting with the handcuffing of Sefolosha, Officer Giacona saw Officer O'Sullivan push Mr. Antic, who fell and landed on the curb. (70:10-12; 71:4-8). Giacona testified that he had not observed Antic do anything aggressive or menacing. (70:16-25; 71:2-4). Nevertheless, he arrested and charged Antic because Sergeant Fontana instructed him to do so. (75:13-17; 76:15-25). He prepared a complaint report that Officer O'Sullivan told him that Antic had grabbed his left shoulder, and that was the basis for the menacing charge and the other charges. (92:2-5; 121:19-25).

10. According to Mr. Antic, he had been at the 1 Oak Club with Thabo Sefolosha and others when the police ordered the patrons to leave. Antic and Mr. Sefolosha are National Basketball Association players. Antic exited the premises with the other patrons and as he was walking away to leave the area, uniformed police officers "started pushing on us." (50H: 22:17-21; 24:6-18). He and the others walked to Tenth Avenue and waited for a livery car to pick them up. As he began to get in the car, he saw the police arresting Sefolosha: "they [the police] taking Thabo left, right. They hit him from the car." (27:19-25). Antic testified that he tapped an officer "On the shoulder like normal human being, because he's with the back; I don't want to go in his face. I say excuse me, sir, why you do this to him, and they just put me on the ground." (28:4-13; 32:14-23; CrTr. 78:1-11). The police officers kept him on the ground, handcuffed him behind his back, and arrested him.

11. Officer O'Sullivan testified in his deposition that he and other officers directed people to move away from the crime scene and move to Tenth Avenue. The officer testified, "Mr. Sefolosha was standing in the middle of the street refusing to comply with moving." (22:23-25). Officer O'Sullivan moved to the corner of Tenth Avenue and West 17th Street. He next saw Sefolosha walking north on Tenth Avenue, and then he observed other officers physically engaged with him. (26:9, 24-25).

12. Officer O'Sullivan testified that he went over to assist the other officers with Sefolosha, and Mr. Antic "grabbed me on my right shoulder" or placed his hand on his shoulder. (44:13-17, 20-23). He described it as "Hard? No, but hand on shoulder diverting attention." (45:2-3). At a CCRB interview, Officer O'Sullivan had stated Antic "Placed his hand on my shoulder." (57:7-8).

3

13. Officer O'Sullivan stated that, "I turned and pushed him away from me." (59:2-3). Antic fell to the ground, where he remained until he was handcuffed, arrested, and transported to the precinct. (75:23; 82:14-21).

14. Officer Richard Caster testified that he and his partners, Officers Dongvort and Porteus, were in uniform performing radio motor patrol when they responded to West 17th Street to assist other uniformed officers already present at the scene of a stabbing. He ordered people on the street to leave the area. He saw Mr. Sefolosha disobey an order of Officer Giacona to leave the area, and he overheard Sefolosha call the officer a midget. (35:2-5). Officer Caster asked Mr. Antic to get his friend out of here, or he's going to get in trouble. Mr. Antic replied that he was trying to do that. (45:3-10; 137:11-14).

15. Officer Caster turned his attention to other people and moved to Tenth Avenue, where he stood with his back to the pizza parlor, Artichoke Pizza, on that corner. According to Officer Caster, he saw Officer Dongvort ushering a man (Amos Canty) on Tenth Avenue when Sefolosha "made a charging, lunging motion towards Officer Dongvort, with his arm extended, in a running motion." (61:7-10). Officer Caster stopped Sefolosha from making physical contact with Dongvort. (64:22-25). He testified that he "stopped him, put my hands on either his arm or his shoulder, or body, and I walked him back towards the street, and I then informed him that he's under arrest."

16. Mr. Sefolosha stated in his CCRB interview in substance that a man (Canty) asked him for money. A police officer moved him away from me, "And I followed, made a few steps to give the person some money . . . I tried to give him the money, and that's when another police officer pushed me on the side. Pushed me from the side, and basically told me that I was going to jail." (CCRB: 6:14-25).

17. Officer Caster arrested Sefolosha, and as he and other officers were handcuffing Sefolosha, Caster saw Antic grab Officer O'Sullivan's shoulder. (83:2-5), or, "put his hand on Officer O'Sullivan's shoulder." (138:10-11).

18. Officer Caster testified that during the entire incident he did not see Antic fail to comply with a police order at any time or menace anyone. (141:16-22; 144:14-15).

19. Officer Dongvort testified that he and Officers Caster and Porteus were in an unmarked police vehicle, assigned to the cabaret unit. (20:15). He was present at Tenth Avenue and West 17th Street, and he opened the door of a livery vehicle so that Sefolosha could get in, but Sefolosha moved toward a man (Canty). Officer Dongvort, with his back to Sefolosha, attempted to move the man north on Tenth Avenue. Dongvort then noticed Officer Caster attempting to place Sefolosha under arrest. (Cr. Tr. 129:1-8). Officers Caster, Dongvort, and Giacona took Sefolosha to the ground and handcuffed him. As the officers were doing so, Dongvort saw Mr. Antic place his hand on the shoulder of another officer. Dongvort was not sure who the other officer was, (82:8-17; 120:13-15), and he said, "I believe it was his shoulder,

4

but I'm not positive." (83:2-3). He testified that he did not see Antic do anything that would constitute disorderly conduct or harassment. (121:6-12).

20. Officer Rossi testified that as the officers were clearing West 17th Street, he saw Antic "slowing walking towards Tenth Avenue." (98:19-22). The officer did not observe Antic do anything that would constitute disorderly conduct. (100:2-7).

21. A civilian witness, Cherrise Porter testified that when the police were handcuffing Sefolosha, Mr. Antic looked like he was asking them what was going on. (36:18-21).

22. Officer Giacona prepared the arrest report for Antic, charging him with:
   (a.) Menacing, P.L. 120.15;
   (b.) Obstructing Governmental Administration, P.L. 195.05; and
   (c.) Disorderly Conduct, P.L. 240.20 (7).

23. Officer O'Sullivan testified that Mr. Antic did not menace him, and was unaware that Giacona included that charge in the arrest report. (90:18-19).

24. The District Attorney's Officer did not proceed with the Menacing charge, but proceeded with the following charges:
   (a.) Obstructing Governmental Administration, P.L. 195.05
   (b.) Disorderly Conduct, P.L. 240.20 (7); and
   (c.) Harassment, P.L. 240.26 (1).

25. On September 8, 2015, Hon. Kevin McGrath dismissed those charges on the motion of the district attorney in New York County Criminal Court.

## OPINION

26. In my opinion, it was a violation of the standards of proper police procedure and practices for the Officers to have arrested Mr. Antic under the circumstances of this case. Police officers are trained that to make a lawful arrest they must have probable cause, and they are trained that probable cause consists of facts and circumstances that would lead a reasonable person to conclude that the person to be arrested committed, was committing, or was going to commit a crime. The officers have not alleged facts that would meet that standard.

27. Officer Giacona, at the direction of Sergeant Fontana, charged Antic with menacing although Giacona testified that he did not observe Antic engage in any aggressive, threatening, or menacing conduct. (70:16-25; 71:2-4). The basis for the charge was Antic's Contact with Officer O'Sullivan's left shoulder, although Officer O'Sullivan testified that Mr. Antic did not menace him, and he was unaware that Giacona included that charge in the arrest report. (90:18-19). Antic admitted tapping O'Sullivan on the shoulder but only to get his

5

attention. Police officers are trained that a charge of menacing requires that the defendant, by means of physical menace, intentionally places or attempts to place another person in fear of death, serious physical injury, or physical injury. Here, touching the officer on the shoulder to get his attention does not constitute an action intending to place the officer in fear of injury, etc., and in my opinion, it was a violation of proper police practices and procedures to have arrested him on the basis of that charge.

28. In addition, Antic was charged with obstructing governmental administration (OGA) even though O'Sullivan was not one of the officers effectuating the arrest of Sefolosha. O'Sullivan characterized the hand on his shoulder as diverting his attention, and he did not state that he was obstructed from performing a police action. Officers are trained that a charge of OGA contemplates intentional physical obstruction, not just incidental contact. In my opinion, it was a violation of the standards of proper police procedure and practices for the officers to arrest the Antic for obstructing governmental administration solely on the basis of him touching O'Sullivan's shoulder to get his attention.

29. Antic was also charged with harassment for the same conduct. Officers are trained that a charge of harassment contemplates an intention to harass, annoy, or alarm another person. Here, Antic did not intend to harass, annoy, or alarm, but merely wished to ask the officer a question about the arrest of Sefolosha. Officer O'Sullivan testified that the contact on his shoulder merely diverted his attention; it did not harass, alarm, or annoy him. Attempting to ask the officer a question had First Amendment implications. Police officers are trained that in consideration of First Amendment free speech rights they are expected to use a high degree of restraint when confronted with citizens questioning their conduct. In my opinion, it was a violation of the standards of proper police procedure and practices for the officers to arrest Antic for harassment solely on the basis of him touching O'Sullivan's shoulder to get his attention to ask him a question.

30. Officer Giacona testified that he believed he could arrest Antic for disorderly conduct because Antic had earlier failed to comply with his order to disperse and Antic was blocking pedestrian traffic. In my opinion, the arrest for disorderly conduct was a violation of the standards of proper police procedure and practices. Mr. Antic had not refused to comply with any officer's direction, and, in fact, he moved from 1 Oak to Tenth Avenue, a distance of 75 feet, as directed by the officers. The police did not arrest him on West 17th Street where the alleged blocking pedestrian traffic occurred. In fact, none of the officers testified that they saw him blocking traffic, and Officer Rossi testified that he saw Antic walking slowly toward Tenth Avenue and he was not doing anything. The arrest of Antic occurred on Tenth Avenue only after Officer O'Sullivan pushed him to the ground.

31. Police are trained that they may use physical force to make an arrest only when the arrest was proper; therefore, because the underlying arrest was improper, the use of force to

6

arrest Antic, pushing him to the ground and handcuffing him, was a violation of the standards of proper police procedures and practices.

## CONCLUSION

32. In my opinion, within a reasonable degree of professional certainty, for all of the above reasons stated, the defendants violated the standards of proper and accepted police practices and procedures when they arrested, restrained, and charged Mr. Antic under the circumstances of this incident. They failed to reasonably assess the facts and improperly proceeded with the unwarranted arrest and improperly attempted to press the unwarranted charges.

Walter Signorelli